Thank you, Your Honor. May it please the Court, Brandon Middleton for the appellants, and with me at counsel's table this morning is my co-counsel Reed Hopper. And with the Court's permission, I'd like to reserve five minutes for rebuttal. Your Honors, the steward appellants have brought as-applied challenges to Section 7 and Section 9 of the Endangered Species Act. The government has contended that the steward appellants have waived their Section 7 challenge, but the District Court never made such a determination and, in fact, explicitly held that the steward appellants do have standing to challenge Section 9, excuse me, Section 7 of the Endangered Species Act in the context of the Delta smelt biological opinion. The position taken by the steward appellants throughout this litigation, including at the District Court, as evidenced by the excerpts of record at page 59, is that the – it is artificial to disjoin Section 7 and 9, the Section 7 and 9 challenges. So for the steward appellants to focus on the take of Delta smelt, that is by no means an abandonment of the Section 7 challenge. And the government has gone further in this case and argued that on briefs before this Court, the steward appellants did not properly present the Section 7 challenge. But, in fact, if this Court were to, for example, look at page 2 of the opening brief, we squarely present the issue of whether Federal regulation of the Delta smelt and intrastate noncommercial species under Section 7 or Section 9 of the Endangered Species Act is an invalid exercise of the commerce clause. At page 11, we state again that the steward appellants have standing to challenge the ESA as applied to the Delta smelt under both Section 7 and Section 9. And finally, we conclude at page 61, the regulation of the species under Section 7 and Section 9 of the ESA is an invalid exercise of the commerce power. So the steward appellants have not waived their Section 7 claim. With respect to the Section 9 argument, the steward appellants have both standing to challenge Section 9 and their claim is right. They have standing to challenge the application of Section 9 in the context of the Delta smelt biological opinion because the United States Fish and Wildlife Service is coercively applying Section 9 to the United States Bureau of Reclamation in a manner that directly results in reduced water deliveries to the steward appellants. This coercive application of Section 9 by the United States Fish and Wildlife Service also makes the steward appellants to Section 9 challenge right. The government has taken the position that in this case, the application of both Section 7 and Section 9 of the Endangered Species Act may be upheld under the Supreme Court's decision in Gonzales v. Raich. But we believe that in this case, Raich simply does not apply. And the reason is because the Endangered Species Act is not a market regulatory scheme, as was the Controlled Substances Act in the Supreme Court's decision in Raich. The Endangered Species Act looks nothing like the Controlled Substances Act, which was directed at commodities. The Endangered Species Act, however, is not directed at commodities. It is directed at endangered species. And the activities that are regulated by the Endangered Species Act, in contrast to the economic activities regulated by the Controlled Substances Act, the activities regulated by the ESA are not economic. They go towards conservation. And so for that reason, the Endangered Species Act is not a market regulatory scheme, and the Raich decision is inapplicable. Mr. Middleton, can you comment on Bennett v. Spears? And I don't think the district court relied on that for standing. Right. And how do you think it affects your standing issue? Well, Bennett v. Spears supports our standing issue. The Supreme Court in that decision made clear that when the United States Fish and Wildlife Service issues a biological opinion, it relies, it coercively relies on Section 9 in order to effectuate the biological opinion. And that is precisely what has happened here. The terms of the biological opinion that make clear that the United States Fish and Wildlife Service has instructed the Bureau of Reclamation to comply with the terms of the biological opinion, or else the Reclamation will face Section 9 liability. So in this case, what we have, again, is a current application of Section 9 that is directly resulting in the loss of water for the restored appellants. And that's why their claim, their Section 9 claim is both right and they have standing to do so. Isn't Spears your strongest Supreme Court decision to support your standing argument? Yes, he is. Was that actually argued to the district court, do you recall? The, if I recall correctly, I believe, and I don't recall whether or not that was argued, the Bennett case was argued before the district court. Because the Raich decision does not apply in this case, what this Court must do is it must look to Lopez and Morrison factors, which this Court held in Alderman are controlling. Under those, under that decision, the Court must follow the four-part test. That is, whether the Delta smelt, the take of a Delta smelt is an economic activity, whether there are legislative findings supporting the determination that Congress is regulating an activity that substantially affects interstate commerce, whether there is a jurisdictional element, which there is not here, and also whether there is attenuation. Now, the key in this case is what is the regulated activity that this Court must determine whether or not it substantially affects interstate commerce. The United States has taken the position that there is a substantial effect on interstate commerce simply because the store dependents and others in the San Joaquin Valley in Southern California have lost water. Now, in other words, they're claiming that because the regulation has caused a substantial effect on interstate commerce, that is enough to pass muster under the substantial effects of the test. But Lopez and Morrison make clear that the standard is not whether the regulation causes a substantial effect test. The issue is whether the activity that is regulated by the United States has a substantial effect on interstate commerce. And again, in this case, the activity that is being regulated by the United States Fish and Wildlife Service is takes of the Delta Smelt. Takes of the Delta Smelt do not substantially affect interstate commerce. Again, if you look at the explicit terms of the provision, the take provision, Section 9A1B of the Endangered Species Act, those terms by no – that provision by no means regulates economic activity. It's completely a conservation statute, and there's no jurisdictional element that would allow the government to make the case that there is a substantial effect on interstate commerce here. In this case, then – Well, the fact is, in most Endangered Species Act decisions, that we're dealing with a species that's fairly local, aren't we? You're talking about all the ones that I can recall outside of the – some broader categories, but mostly we're talking about indigenous species that are very localized, aren't we? So what your argument is, is that we ought to upend about 80 percent of the Endangered Species Act, right? Well, our argument, again, Your Honor, is simply an as-applied challenge to the application of the Endangered Species Act, Section 7 and Section 9. But, I mean, the logical conclusion of your argument is that 80 percent or so – and I'm just pulling that out of the air, but it seems correct to me – 80 percent of the Endangered – the species covered by the Endangered Species Act will no longer be protected, right? Well, again, Your Honor, it's the conclusion based upon our – from the decision that this Court will make whether or not the Delta Smelt regulation of that species does have a substantial effect on interstate commerce – or, excuse me, the activity that take of Delta Smelt has substantial effects on interstate commerce. Well, what is the activity that's taking the smelt? The activity – the regulated activity that this Court must look to in order to determine whether or not the Federal Government is regulating an activity that substantially affects interstate commerce is the take of Delta Smelt. It's not the – as the government intended, it's not the operation of the Central Valley Project or the State Water Project. What's resulting in the take? What's resulting – the – nothing results from the take. When a take of a Delta Smelt happens – No. What's causing it? The take of a Delta Smelt is caused by, in this case, the operation of the Central Valley Project. But we would submit that that does not – They're not in interstate commerce. Is that true? Our position is that the Federal – the United States Fish and Wildlife Service, when it applies Section 7 and Section 98 of the Indian Species Act to the Delta Smelt, as it has done in this case, is that it is not regulating interstate commerce. And your clients?  The Federal Government's application of these provisions. Now, that's – it's true that our clients are – you know, our commercial clients, they do farm. But again, the standard here is not whether the effect of the regulation causes a substantial effect on interstate commerce. It's a narrow approach that this Court must look to. But, Mr. Middleton, hasn't every circuit that has addressed that question rejected your view? And I'll use it as an example. The Eleventh Circuit, I believe, in the Alabama Sturgeon case, where they found that the Alabama Sturgeon was an intrastate species. That is – there is certainly no question, Your Honor, that the circuits, including the Eleventh Circuit, have considered the constitutionality of the application of the Endangered Species Act and have upheld the ESA. But we would submit that if you look at those decisions, they cannot be read together to have one single rationale supporting the constitutionality of the ESA. Specifically, with regard to the Eleventh Circuit decision in Tom Bigby, there are two critical issues that we think demonstrate that that decision was wrongly decided. The first is the standard that was articulated by the Eleventh Circuit in that case. Again, the standard here is whether the activity regulated by the government substantially affects interstate commerce. But the Court in Tom Bigby was explicit that the standard, all it needed to demonstrate was that the effect of the regulation, the effect, which is not the standard, causes a substantial effect on interstate commerce. Is Tom Bigby squarely on point in this case? In other words, do you have any way to distinguish it or would we simply have to disagree with it to rule it in your favor? You would have to disagree with it, yes, Your Honor. That is correct. And I should also point out, Your Honor, that one other problem with Tom Bigby compared to this Court's jurisdiction is that this Court has indicated in Alderman that the Tom Bigby decision or, excuse me, this Court indicated in Alderman that the Lopez and Morrison factors are controlling. So this Court must apply those factors in order to determine whether there is a substantial effect on interstate commerce. But again, Your Honor, the Alderman decision did not even mention those factors whatsoever, and we would submit that that decision was wrongly decided. Now, if you're the statute at issue, we're simply directed at the delta smelt. In other words, that's the only species covered. I think your argument has some force, but the Endangered Species Act covers a number of species and has a broad national approach. What's the principal difference between that and REACH? In REACH, we're talking about governing a nationwide we're setting a nationwide standards on a regulated industry, and that's what essentially the Endangered Species Act is doing here. If, as if, for example, Congress passed an act solely directed at local growers, marijuana growers in Oakland, that might be a different matter under REACH. But REACH was directed to a broad regulatory scheme, so. Well, with respect to the latter point with regard to local growers, one distinguishing factor is that in those cases, in that case as well as in REACH with the national scheme, the underlying activity, that is, the production and consumption of wheat or, excuse me, of marijuana, is economic. Again, that's not the case here.  I didn't understand. The activity that His Honor referenced with regard to the production of marijuana is economic. Oh. In this case, the activity that is being regulated here, again, is not economic. But I think Your Honor was getting to a broader point, and that is, how can the Endangered Species Act be distinguished from the Controlled Substances Act and REACH? And the answer is that simply by looking at the face of the statute, the face of the statute in the Controlled Substances Act regulated commodities, and it regulated economic activities, and the intent was to control the market, the supply and demand of commercial commodities. That clearly was not the intent of Congress when it enacted the Endangered Species Act. It's addressed at endangered species, not commodities, and the activities regulated by Congress through the ESA are not economic. So is your argument really, at the end of the day, that the entire Endangered Species Act violates the Commerce Clause? No, that's not our argument, Your Honor. Tell me why it doesn't, following your logic. Well, because what this Court – what may be able to be done with regard to a certain commercial species, say, for example, salmon, the take of a salmon, which is a commercial species, may be able to be sustained under a four-part test. It's an – the take of a – you know, for a commercial fisherman, for example, if he takes a fish, that may be able to, under the test, may be able to demonstrate a substantial effect on our state commerce. The delta smelt is not the – But the person who takes the water that the fish needs in order to swim upstream to spawn is not. Well, again, the – I think – I don't understand that. I think what Your Honor is referring to, that's the broad way of looking to what is the regulated activity under the substantial effects of the test. And our position is that the Court has to look narrowly as to what the – as to what the regulated activity is. Yeah. And what is – and your authority for that is? Our authority is Lopez and Morrison. Lopez and Morrison. Yes. That's it. Well, it's also – it's also the – this Court's decision in Alderman. Alderman concerned the regulation of – it looked narrowly – it's – the Alderman decision looked narrowly at the narrow activity. And I'd also – I'd also refer, Your Honor, to Chief Justice Roberts' point when he was a circuit judge on the Rancho Viejo decision, and that was that the court – the Supreme Court had facial challenges before it in Lopez and Morrison. And it could have held that the application of those – the provisions that were at issue substantially affected interstate commerce, for example, in Morrison with interstate extortion. But it looked narrowly at gender-motivated violence, and that's why the Court must take a narrow approach in this case. When has the Court followed Morrison? I'm sorry? When's the most recent time the Court has followed Morrison? The most recent time the Supreme Court followed Morrison is in Raich. Raich. It did that decision. Okay. So I'll save time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Charles Scott from the Justice Department on behalf of the United States. I am going to leave at least five minutes of time for counsel for the interdefendant, Mr. Orr. I'd like to make five points, one on jurisdiction and four on the merits, and I will try to be as brief as possible. The first is to standing. The steward appellants here simply have not established standing to challenge the application of section 9 to the Delta smelt or to the operations of the Central Valley Project. I have to speak up because we have a lot of people in the courtroom and the acoustics aren't terrific. Is this better? Yes. The appellants essentially contend, looking at Bennett v. Speer, that the existence of the biological opinion can be used as a proxy for the imposition of section 9 liability, and therefore, because there's a biop, they have standing to challenge section 9. This is backwards. A biological opinion with an incidental take statement makes it less likely that section 9 liability will be imposed than if there were no biop. Therefore, under the Supreme Court's decision in summaries of the Earth Island Institute, there is no concrete and imminent application of section 9 that they can challenge. I'll explain what I mean by that. In Bennett, Justice Scalia wrote that a biological opinion, although theoretically advisory, in practice is not. Agencies have an independent obligation under section 7 not to jeopardize the continued existence of listed species. Justice Scalia wrote in Bennett that this any indication that that duty under section 7 is not mandatory conflicts with the plain face of the statute. He also wrote that as a practical matter, in order to comply with the section 7 prohibition on jeopardy, action agencies typically comply with the biological opinion that the expert agency has provided for them. Here there is no indication, for example, that the Bureau of Reclamation has any intent to depart from the biological opinion. If you comply with the biological opinion, you are exempt from section 9 liability. This Court must presume that agencies will follow the law and that their actions will be valid. And the cases that I'm referring to for those presumptions are Pitt River Tribe v. U.S. Forest Service, 615 F3rd at 1082, and River Runners for Wilderness v. Martin, 593 F3rd at 1064. Given the presumption that the Bureau of Reclamation will follow its duty to not jeopardize the continued existence of the Delta smelt, and given the existence of a biological opinion that, as Justice Scalia wrote, as a practical matter, the action agency almost inevitably follows, it simply cannot be said that imposition of section 9 liability is in any way imminent or likely in this case. They don't have standing to challenge section 9. But, Mr. Scott, Justice Scalia's opinion expanded the scope and rejected the zone of interest test and broadened the scope for citizen suits. As a matter of fact, I'm quoting from the opinion right now. The first question in this case is whether the citizen suit provisions negate the zone of interest test. We think it does. The first operation portion, and then it goes on to say that it expands. So I think you've read it much more narrowly than what Justice Scalia wrote. Excuse me. With respect, Judge Bennett, I am talking about Article III standing. Under Summers, there has to be a concrete imposition of section 9 liability. We don't even get to the question of the zone of interest under the statute. There has to be, under Summers, some indication that imposition of section 9 liability is likely. That simply is not present here by the logic of what Justice Scalia said about section 7. A biop of theoretically advisory is something that action agencies almost inevitably follow. And if they follow it, they're immune from section 9 liability. So my point is that when you're dealing with third parties, your theory means that they will never have a chance to challenge a biological opinion or raise a challenge, because the agency is going to follow the law. They don't want the agency to follow the law. That's the conundrum here. That is exactly. So why? So why? You know, it's – I understand your logic, but as applied to third parties, what it means is they can never sue. True? No. They have standing, most likely under Bennett v. Speer, to challenge the application of section 7. And the agency is going to comply with the biop to avoid jeopardizing the species. That provides standing to say section 7 is going to be applied to the operations of the Central Valley Power System. And we have standing to challenge it. I think that would probably work under Bennett v. Speer. But what about the coercive power then to – under section 7 to enforce – I'm sorry, the coercive power that would enforce the biological opinion? Why isn't that enough? There is an equal coercive power on the action agency to follow its statutory obligation not to cause jeopardy. I would point the Court to – I mean, their argument is that by the implied or actual coercive power, then they are injured. But that totally ignores that the action agency must not cause jeopardy to the listed species. It's pretty clear. I'd like to – No, I understand your point. But I think it's what the inevitable result is that they don't ever have standing to challenge the action. They have standing to challenge the biological opinion. That does not have to derive from section 9. I think what our discussion may be illustrating is that here the appellant's We're challenging section 9. Section 9 is really doing the work here. And section 7 is merely an accompaniment to it. They still want to then say, oh, and we also have standing to challenge section 7. None of the other four courts of appeals to uphold the ESA under challenges to – under Commerce Clause challenges, we're dealing with a biop, a biological opinion, excuse me, that directly regulated such a clear economic activity as water diversions for agricultural use. This case is somewhat different on its facts. Those cases all involved section 9 liability in, excuse me, the Gibbs case, I believe, or the Tom Bigby case might have involved the actual listing of the species under section 4. The others involved liability under section 9. In all of those cases, the plaintiffs either had been told your development activities are going to incur section 9 liability or that there was the – or had already faced such liability. I think in the Gibbs case, someone had shot one of the wolves at one point, although I'm not sure that he was one in the standing declarants. Here, the proper regulated activity must be the biological opinion's restrictions on the Central Valley Projects and State Water Project. And there are a number of reasons why that is. The first is simply the appellant's own explanation of their standing.  The biological opinion has reduced our deliveries of water. That has made it more difficult and more expensive for us to sell our crops into interstate commerce. That is their standing. That is the nature of their challenge. They've made it an as-applied challenge, too. This is not a facial challenge to the statute. As the D.C. Circuit wrote in the Rancho Viejo case, if you're going to make it an as-applied challenge, you don't then have the luxury of saying, I'm bringing an as-applied challenge to the application of the ESA to this species, but not with any regard to my own activities. The Supreme Court in Broderick v. Oklahoma, 413 U.S. at 610, 1973, explained that a plaintiff bringing an as-applied challenge cannot challenge the constitutionality of the statute divorced from his own circumstances and say, in some other circumstances, this would be invalid. Because this is an as-applied challenge, the court must consider the regulated activity to be operation of these water diversion mechanisms in accordance with the biological opinion. Mr. Scott, are you familiar by any chance with the February 3rd decision by the Ninth Circuit in Barnum-Timber? I am not, Your Honor. It's a Clear Water Act case, but it has a section on standing. That's fine. I didn't really expect you to be, but I wanted your input if you were familiar. I would be happy to provide supplemental briefing if Your Honor would like. I have not looked at that case. I'd also like to point out that even if you took the appellant's view of this, contradicted by Rancho Viejo, and said, all right, the activity or the regulated activity that we're challenging here is the prohibitions on jeopardizing or taking delta smelt in the abstract, that still would be an economic activity. Just as in the Tom Bigby case, this is a fish that we have evidence had some commercial value in the past.  There is a huge market in trade, in illegal trade on endangered species that makes this case, that makes the Endangered Species Act as a whole somewhat analogous to the statute in Rache. And I would be unable to comment on that. Well, the record evidence says that at some point the smelt was used as baitfish, but I gather it is no longer used as baitfish. True? To my knowledge, it is now, it may be caught as bycatch in a commercial baitfish fishery. It is not the target of that fishery. It was, as we know from the record, part of a lucrative baitfish fishery. That's a lot like the red wolf in Gibbs, which was known to have past commercial value in terms of trade and its pelts. The example that the Court gave in Gibbs, again, of the American alligator, which had past commercial value and was then brought back to a recovered status and trade was able to resume. And furthermore, we just, the delta smelt, as Congress found, we don't know what the potential value of any listed species may be. Take the example of the rosy periwinkle in the Tom Bigby case, a tiny little flower that was almost driven to extinction before anybody realized the scientific value it might have in treating leukemia. I think it's fair to say now, though, isn't it, at the moment, that it has no I take your point about the future. I take your point about the past. But right now, as far as anyone knows, it's not a commercially viable product in any form. It has no known commercial value at the present moment. But that does not make application of the Endangered Species Act's protections to it in any way unconstitutional. This is a statute, a comprehensive regulatory statute, as all four courts of appeals have found, that has a substantial relation to interstate commerce. And under Raich and under the Supreme Court's decisions going all the way back to 1937, it would be impossible to excise the statute's application to one particular species that may at current not have a known commercial value in order to find a constitutional violation. That would be at odds with Congress's expectation that these species might turn out to have future values. I want to point out that the fungible goods argument that opposing counsel is saying Raich and Wickard should be limited to was rejected by the Tom Bigby case. The Supreme Court has applied the substantial effects standard to uphold a variety of types of regulation, including of racial discrimination and worker safety, mine reclamation, environmental protection standards. The notion that these cases can all be reduced to application only to something that is a fungible good is incorrect. And as we noted in our briefs, there is a substantial and illegal market in trade in endangered species that is somewhat analogous to the illegal drug trade in Raich. The four Lopez and Morrison factors, Raich didn't apply them. Alderman quoted a 2003 decision, McCoy, that said this is the controlling standard, but it didn't consider them either. It only looked at the presence of a jurisdictional element. The McKella and Stewart cases that we cited likewise do not apply these factors. They are not the controlling test. Lopez and Morrison say that Congress may not regulate an economic, a non-economic activity in a traditional State police power area that has at best a tenuous connection to commerce. That is not the circumstance here. Alito, Mr. Scott, can I return to Bennett v. Spears for a minute? I think you were right. I was focusing on the wrong section. But with regard to Article III standing, they actually address the aggregate water issue. And Justice Scalia said that it was sufficient if the plaintiffs pled that the aggregate amount of water was reduced. They didn't even have to plead that the amount of water they were allocated was reduced because that could be fleshed out later in the case. But it was sufficient for Article III standing just to allege the aggregate amount of water. Isn't that exactly the situation here? As a matter of fact, they've pled more than that here. It is the same situation insofar as they challenge Section 7. Bennett was about the application. It was a challenge to the application of Section 7. Justice Scalia found that there was standing, albeit at the earlier motion to dismiss stage, where the representations that need to be made to establish standing are not as detailed. So I think, yes, Bennett may be on point with regard to standing to challenge Section 7. It doesn't say anything about standing to challenge Section 9. And we think that under Summers, in the absence of a concrete and imminent imposition of Section 9 liability, you don't have standing to challenge Section 9. If I may, I'd like to quickly close by pointing out that this Court could uphold the ESA's application here, even if it finds the Delta smelt, its application of the Delta smelt is non-economic and has no substantial effect on interstate commerce under the Necessary and Proper Clause. In Justice Breyer's Comstock opinion, he recently explained that the inquiry under the Necessary and Proper is, is the particular regulation at issue a rational means of achieving a constitutionally valid end. Here, the appellants would not dispute that Congress does have Commerce Clause power to protect species that have a known commercial value, maybe ones in which there is an illegal market. Given the fact that Congress does not – given the fact that none of us know what value some species may have, something that Congress was specifically aware of, I think that expanding these protections to cover species that may in the future have some value should be valid under the Necessary and Proper Clause. And I think that is also somewhat illustrated in Justice Scalia's concurrence in Raich, which said that even if it is not economic and doesn't have a substantial effect on interstate commerce, it may still be valid under the Necessary and Proper Clause. And I'll leave the rest of my time, unless the Court has questions, to Mr. Rohwer. Good morning, Your Honors. Trent Rohwer for the Defendant Intervenors, Natural Resources Defense Council, and the Bay Institute. I will attempt to keep my remarks very short here. I wanted to briefly address the notion that Raich somehow does not apply here, that it is distinguishable from – that the Controlled Substances Act in this context is somehow distinctly different from the Endangered Species Act. One thing that the appellants don't mention anywhere in their briefs, or don't contend with, and it's raised in our briefs, is that the Endangered Species Act specifically regulates economic activities. They constantly say that it's not an economic regulation statute. And yet, Section 7, which is at issue here, directly regulates every federal activity that would cause development on federal land, or any licensed activity by the federal government that would occur on public land. Those – the things like timber sales in the national forests, the development of ski resorts, offshore oil drilling – all those sorts of things require federal licenses, and they're very much in interstate commerce. At the same time, Section 9, which the appellants talk a lot about, has specific prohibitions against interstate commerce in listed species. And part of that is because of the problem that Mr. Scott mentioned, which is that there is a perverse market in endangered species. There are collectors around the world who are interested in having something because there are so few of them left. And they also are wrong in their point that the statute has to be somehow economically motivated, that is, Congress had to be motivated to have an economic purpose in passing the statute. That's not the test. The test is, does what the statute does substantially relate to interstate commerce? And I would posit that the purpose behind the Controlled Substances Act is more our justifiable societal concern with the health and other effects of recreational drugs than it is to regulate a market in the sense that you would regulate a market in wheat. And in the same way, the Endangered Species Act obviously is intended to preserve biodiversity that our country pays a lot of attention to, but it has obvious economic effects. And I suppose that's where I would like to go in the rest of my remarks, is to point out what I think is one of the most wrongheaded arguments that's made by the other side. And these are arguments that these same lawyers, not their clients, have made in each and every one of these cases in the other circuit. The Pacific Legal Foundation has been either a party or an amicus in all of those cases. And they continually talk about how it's preposterous, it's remote and speculative to think that biodiversity, our nation's wealth of biodiversity, has anything to do with commerce. And as we quoted in our brief, as the late Senator Gaylord Nelson said, the economy is a subsidiary, a wholly owned subsidiary of the environment and not the other way around. That may not be an exact quote, but he said words to that effect. And it boggles the mind to hear that there is no connection here at this day and age and in our current state of biological knowledge, the ecosystem services that are provided by biodiversity, whether it's things as obvious as the wild fish we eat or the timber and paper we get from our forests, to the vegetated watersheds that we get our water from, to pollination provided to our nation's crops and wild plants by birds and bees and bats. Our livelihoods depend on the nation's biodiversity. Congress, in its wisdom some years back, recognized this. They identified in the legislative history that they were concerned about the values of biodiversity, and they made a rational choice to protect each and every link in that system of biodiversity, every species, because we don't know when one goes extinct whether that's going to bring a downfall of a whole number that we live to regret. And so if the Court gets to the issues, and I think it will, of whether this complies to the Commerce Clause or not, I think it's critically important to recognize the obvious environmental value of biodiversity. And I'll stop there unless you have any questions. Roberts. Don't appear to be any. Thank you. Your Honors, nothing in the record supports the notion that there ever has been or ever will be a commercial market in delta smelt. Now it is true that at some point the delta smelt was harvested, incidentally, with other species, but the Service recognized the smelt to be a distinct species. So there's nothing here that supports the notion that the delta smelt is a commercial species. The United States Fish and Wildlife Service has not demonstrated that the take of a delta smelt does substantially affect interstate commerce. And this, as applied challenge, there may be other circumstances where the Service or NIMFS may be able to make that demonstration with species, but in this case it has not made that demonstration. And so the application of Section 7 and Section 9 of the Engineering Species Act are unconstitutional. I'd also like to clarify one remark I made when I was here earlier, and I think it was a little bit confusing with respect to when this Court, how this Court has determined what the regulated activity is for purposes of the Commerce Clause analysis. And I want to make clear that in the Alterman decision, the defendant in that case possessed body armor during the attempted possession of cocaine. But for purposes of the Commerce Clause test, the Court looked only to whether possession of body armor substantially affected interstate commerce. It did not take a broad regulated activity view, as has been taken by the government. So the application of Section 7 and Section 9 in this case are unconstitutional, and that's why we think the District Court should be reversed. Thank you. Thank you.
judges: Bennett, Schroeder, Thomas